# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. 3:15-cr-7 |
| v. | |
| EDWARD LAVON FERRIS, | OPINION & ORDER |
| *Defendant.* | JUDGE NORMAN K. MOON |

Petitioner Edward Lavon Ferris, *pro se*, filed a motion to vacate, set aside, or correct his sentence, pursuant to 28 U.S.C. § 2255. (Dkt. 163). Ferris claims that he was denied the effective assistance of counsel because, in Ferris's view, his Trial Counsel failed to present an actual innocence theory of the defense despite Ferris's maintenance of his innocence and because his Trial Counsel allegedly failed to investigate certain factual issues and call certain witnesses. (Dkt. 166). The Government filed a motion to dismiss addressing the merits of Ferris's claim. (Dkt. 175).

Finding no basis to rule that Ferris's Trial Counsel was ineffective, the Court will deny Ferris's petition and grant the Government's motion to dismiss.

## BACKGROUND

In November 2015, following a five-day trial, a jury convicted Edward Lavon Ferris of aggravated bank robbery, brandishing a firearm during a crime of violence, being a felon in possession of a firearm, conspiracy to obstruct justice, causing another to corruptly destroy or conceal evidence, and attempting to influence, obstruct, or impede the administration of justice. (Dkt. 93, 97). The jury hung on another felon in possession of a firearm charge and acquitted Ferris on a witness tampering charge. (Dkt. 97). In March 2016, this Court sentenced Ferris to a

term of 86 months in prison to run concurrently on five of the six convictions, and another 86 months to run consecutively on another conviction (for a total of 172 consecutive months in prison). (Dkt. 116). Shortly thereafter, Ferris unsuccessfully appealed his convictions to the Fourth Circuit. (Dkt. 137). Now, Ferris moves to vacate, set aside, or correct his sentence pursuant to § 2255.

The events underlying his convictions occurred on January 6, 2015.[1] That morning, a man wearing a ski mask entered a SunTrust Bank branch in Culpeper, Virginia, pointed a revolver a teller, and robbed the bank of more than $3,000. He fled without being apprehended. The Culpeper Police Department ("CPD") found a distinctive set of shoe prints leading to and from the bank, beginning and ending in a nearby parking lot and winding through an alley behind the bank. Tire impressions in the snow showed that a car had backed into a space and then left. The shoeprints started from the passenger side of that car, led to the bank, and then ended back at the driver's side of the car. There were no other tire impressions nearby, and a shoeprint inside the bank matched the shoeprints in the snow.

Over the next few weeks, CPD received numerous tips about the robbery; one of those tips identified Ferris as the robber. On January 29, 2015, Ferris was arrested on unrelated charges at the home of Darlene Pollard, mother of Giovanni Waters (or "Wiz") and Kecia Waters. The police had located Ferris after Wiz's girlfriend, Sherry Scales, notified CPD that Ferris was at Pollard's home.

Later that day, CPD Lieutenant Andrew Terrill visited Ferris's parents' home. Lieutenant Terrill told Alfred Nelms, Ferris's stepfather, that he was investigating a larceny and wanted to establish Ferris's residency. Lieutenant Terrill said he referenced a "larceny" to avoid alarming

---

[1] The facts described are pulled from the Fourth Circuit's opinion on the direct appeal (Dkt. 136) and the evidence presented at trial (Dkt. 128–132).

Mr. Nelms that he was really investigating the bank robbery. Mr. Nelms then called his wife, Peggy Nelms, to tell her that the police had been to their house inquiring about a larceny and that the officer wanted to come back to search Ferris's room.

At 2:20 p.m. that same day, Ferris called his mother, Mrs. Nelms, from jail. During this conversation, Mrs. Nelms told Ferris that police officers had been to her home, that they wanted to search Ferris's room, and that they said "something about a robbery." Ferris asked if the police had gone into his room, and Mrs. Nelms said no. She told Ferris that the police would be coming back and asked whether he needed her to go into his room. He said he did, that he needed her "to get all his clothes on his bed" and "a little black zipper thing on his bed with something in it." When she stated that she was at work, he told her he would call Wiz and ask him to do it.

Ferris then called Wiz, and urgently directed Wiz to go to his mother's home and remove some property, including, among other things, various items worn or used during the bank robbery, i.e., the big jacket and a box with shoes, and a gun (referred to as "junk"). During the call, Ferris told Wiz that he believed the police would return with a warrant.

Right after that call, Wiz, driven by Scales, went to the Nelms' house and took from Ferris's room a bag containing a North Face jacket, a shoebox with a pair of shoes inside, a brown gun case with a gun inside, and various items of clothing.

In a follow-up call, Wiz confirmed that he had retrieved the items. Ferris responded: "Man, y'all save a motherfucker life."

Then, Wiz directed Scales to drive down a rural road, where Wiz tossed the bag with the items from the Nelms' home onto the side of the road. Later that day, however, Scales alerted CPD and told an officer where Wiz had discarded the items. She also took a picture of the gun

that was in her car and sent the photo to CPD. She said that the gun had not been in her car when she first drove to the Nelms' home.

By later that same afternoon, the police had recovered the items on the side of the road. They found the shoebox, shoes, and trash bag containing a black North Face jacket. The shoes were size 10.5 and looked like the shoes worn by the robber, and the soles matched the footprints in and around the bank. The North Face jacket resembled the jacket worn by the robber and had adhesive residue consistent with duct tape on its various logos; the bank surveillance video showed that the robber's jacket had some type of covering over the logos. Shortly thereafter, Wiz was arrested for concealing evidence of the robbery, and he ultimately pleaded guilty. Sometime in the next few days, Wiz's sister, Kecia, and Scales retrieved a gun from Wiz's cousin's house, and on February 8, 2015, they turned it in to CPD.

Federal prosecutors charged Ferris by complaint in May 2015 (Dkt. 1), and a grand jury returned an indictment in June 2015 (Dkt. 18), followed by a superseding indictment in October 2015 (Dkt. 43). Ferris proceeded to trial in November 2015. In the lead-up to his trial, Ferris crafted a theory of the defense and investigation plan with his Trial Counsel. (Ex. 1 to Dkt. 175). They discussed what evidence Trial Counsel would gather and which witnesses Trial Counsel would call. (*Id.*). Most relevantly for the purposes of this opinion, they discussed the possibilities of (1) calling Jamar Green (or "Getty"), who Ferris believed could testify that Ferris was not home during the robbery and (2) gathering cell site "geolocation" date to show Ferris' location around the time of the robbery. (*Id.*).

Some of Ferris's requests made Trial Counsel uncomfortable. (*Id.*). Ferris repeatedly requested that Trial Counsel interview Ferris's parents again to see if their story had changed (Ferris wanted them to say that he was home during the robbery). (*Id.*). Trial Counsel, having

4

already gathered statements from Ferris's parents that he was not home during the robbery, wrote to Ferris:

> I am not in the business of suborning perjury. This is not a game, in which I would coach you to come up with some kind of story to get out of this. That is for television legal dramas. I will fight very hard for you in every honest way I can. What I cannot do is fight for you in a dishonest way.

(*Id.*)

Trial Counsel and Ferris also discussed the plan that Trial Counsel would present an actual innocence theory of the defense. (*Id.*). At trial, Trial Counsel did, in fact, present an actual innocence theory. He presented an opening statement previewing the evidence that would tend to show Ferris's innocence, cross-examined the government's witnesses to cast doubt on their testimony, and presented a closing statement arguing that Ferris was innocent. (*See* Dkt. 128–132). However, during his opening statement, Trial Counsel made a stray remark that Ferris now claims undermined his actual innocence theory. At the very beginning of his opening statement, while setting up an alternative narrative to the one the government had just presented during its opening statement, Trial Counsel claimed that Wiz, not Ferris, had committed the robbery:

> Mr. Ferris is dying to get up here and tell you of his innocence, that he didn't do this; he factually, actually did not do this bank robbery. Not a lawyer's trick, not a loophole; he did not do it. Somebody did it. And that somebody is probably Giovanni Waters, the man they call Wiz. The same age, the same height, roughly the same build. Giovanni is a little skinner [sic] than he is. **Both were involved**.

(Dkt. 128 at 94) (emphasis added). Trial Counsel now claims to not remember why he said "[b]oth were involved" or what he might have meant by it, because his defense (as revealed by the rest of the quoted statement) was that Ferris did not commit the robbery. (Ex. 1 to Dkt. 175). Trial Counsel states that he probably meant to emphasize the similarities between Ferris's and Wiz's heights and builds, not to claim that both were involved in the bank robbery. (*Id.*).

5

Ferris's § 2255 petition raises an ineffective assistance of counsel claim, arguing that his Trial Counsel was deficient (1) because he failed to present an actual innocence theory, and (2) because he failed to investigate and/or present certain evidence that Ferris believes would have been favorable to his case. (Dkt. 163, 166).

## STANDARD

In order to obtain relief on a motion under 28 U.S.C. § 2255, a petitioner must establish either an error of constitutional or jurisdictional magnitude which could not have been raised on direct appeal. *Hill v. United States*, 368 U.S. 424, 428 (1962). Errors of law and errors of fact do not provide a basis for collateral attack unless the error constitutes "a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Addonizio*, 442 U.S. 178, 185 (1979).

A petitioner collaterally attacking their conviction or sentence must prove by a preponderance of the evidence that the sentence was imposed in violation of the United States Constitution or laws, that the court lacked jurisdiction to impose such a sentence, that the sentence exceeded the maximum authorized by law, or that the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255; *see also Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958).

One such way to show constitutional error is by establishing the ineffective assistance of counsel. The Sixth Amendment guarantees criminal defendants effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 685–86 (1984). To demonstrate that they were denied the effective assistance of counsel, a petitioner must show that their counsel's performance was deficient and that they were prejudiced as a result. *Strickland*, 466 U.S. at 687. Under *Strickland*'s "deficiency" prong, a petitioner first must show that their lawyer's

performance "fell below an objective standard of reasonableness." *Id*. at 688. And under *Strickland*'s second prong, a petitioner also must show prejudice, in the form of a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

Certain kinds of errors at trial constitute "structural" errors that automatically render the proceeding unfair to the defendant and thus fall outside of the *Strickland* analysis. *See U.S. v. Gonzalez-Lopez*, 548 U.S. 140 (2006) (distinguishing "trial error[s]" which "occur during the presentation of the case to the jury" and the effect of which may "be quantitatively assessed in the context of other evidence" and are subject to harmless-error review, from "structural error[s]" which "defy harmless-error standards because they affect[t] the framework within which the trial proceeds, and are not simply an error in the trial process itself.") (quoting *Arizona v. Fulminante*, 499 U.S. 279, 306–310 (1991)) (cleaned up). One such structural error is the denial by counsel of a defendant's right to assert that they are actually innocent of the offense of which they are accused. *McCoy v. Louisiana*, 584 U.S. ___; 138 S.Ct. 1500, 1511 (2018) (holding that "counsel's admission of a client's guilt is over the client's express objection is error structural in kind" where counsel admitted guilt at sentencing phase of death penalty proceeding).

## ANALYSIS

The parties have raised no procedural or jurisdictional issues, so the Court will proceed directly to the merits.

<u>Trial Counsel's Alleged Failures to Gather Certain Evidence and Call Certain Witnesses</u>

First, Ferris argues that Trial Counsel's alleged failure to gather certain evidence and call certain witnesses at trial denied him the effective assistance of counsel. (Dkt. 166). These alleged errors include Trial Counsel's failure: (1) to obtain a cell site expert to provide geolocation

evidence concerning Ferris's cell phone, (2) to obtain a video expert, and (3) to call Jamar Green as an alibi witness. (*Id.*).

Quite simply, none of those decisions evince deficiency. Rather, Trial Counsel had clear and reasoned justifications for each of those decisions. With respect to the cell site data, Trial Counsel states that he asked Ferris if Ferris wanted Trial Counsel to obtain cell site data, and Ferris, looking alarmed, said no, and later told Trial Counsel that his cell phone was broken during the robbery. (Ex. 1 to Dkt. 175). Trial Counsel states that he in fact filed a motion to keep such geolocation data out of evidence at Ferris's request. (*Id.*).

With respect to the video expert, Trial Counsel states that he does not recall any discussion between himself and Ferris about obtaining a video expert, and at any rate that such an expert would not have been helpful because the video of the robbery (which was blurry) was not the "strength of the Government's evidence" and because he does not believe that such an expert would have even been available. (*Id.*).

With respect to Jamar Green, Trial Counsel states that he does not recall Ferris asking him to call Green at trial, and that calling Green would have been bad for Ferris's defense. (*Id.*). Ferris believes that Green would have testified that Ferris was at home during the robbery. (*Id.*). In the months leading up to trial, Ferris attempted to have Trial Counsel convince Ferris's parents to testify that he was home during the robbery, but they had repeatedly insisted that he was not, and Trial Counsel refused to coerce such testimony from them. (*Id.*). Trial Counsel states that calling Green to testify to the contrary—that Ferris was home during the robbery— "would have amounted to Mr. Ferris's attacking his own well-meaning parents' recollections otherwise, a very bad idea in terms of achieving his goal of persuading this jury to find reasonable doubt." (*Id.*). In addition, Green had actually told law enforcement that he *did not*

8

pick Ferris up from his parents home, so it is not at all clear that Green would have testified otherwise at trial, and, even if he had, he would have been presented with his prior inconsistent statement. (*Id.*).

None of these decisions evince deficiency. They were reasoned tactical decisions. Indeed, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 690–91).

In short, Ferris has not shown that Trial Counsel's performance at trial was deficient within the meaning of *Strickland* with respect to Trial Counsel's alleged failures to gather certain evidence and call certain witnesses.

### Trial Counsel's Alleged Failure to Present an Actual Innocence Theory

Second, Ferris argues that Trial Counsel's stray remark during opening—that "[b]oth were involved" with respect to Ferris and Wiz—constitutes structural error because it denied him the right to present an actual innocence theory. (Dkt. 166). Indeed, if Trial Counsel had, in fact, gone against Ferris's express objections and conceded guilt, then the Court would find structural error. *See McCoy v. Louisiana*, 584 U.S. ___; 138 S.Ct. at 1511. But that is not what happened here. Trial Counsel did not concede Ferris' guilt. Trial Counsel presented an opening statement that, stray remark aside, previewed the evidence that would tend to show that Ferris was not guilty, cross-examined witnesses to raise reasonable doubt, and presented a closing statement arguing that Ferris was not guilty. (*See* Dkt. 128–132). Although the stray remark is confusing on a cold record, it does not come close to meeting Ferris's burden to show that his conviction was imposed in violation of his Sixth Amendment right to counsel. *See* 28 U.S. § 2255. The stray remark does not undermine the rest of the evidence presented and argument made at trial.

In short, there was no structural error for denial of Ferris's right to present an actual innocence theory at trial.

## CONCLUSION

For those reasons, Ferris's § 2255 motion, Dkt. 163, is DENIED with prejudice, and the Government's motion to dismiss, Dkt. 175, is GRANTED.

It is so ORDERED.

The Clerk of Court is directed to send this order to Defendant and all counsel of record.

Entered this  28th  day of March 2022.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE